UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LANCE MORNINGSTAR,<br><br>Plaintiff,<br><br>v.<br><br>ALEXIS AGUILERA, FWPD #1997f,<br>*Officer, in official and individual capacities,*<br>*et al.*,<br><br>Defendants. | CAUSE NO. 1:22-cv-273-HAB |

OPINION AND ORDER

Lance Morningstar, a prisoner without a lawyer, is proceeding in this case against Officer Alexis Aguilera, Officer Michael Bodeker, and Officer Whitney A. Woods "in their individual capacities for compensatory and punitive damages for subjecting him to excessive force on October 5, 2020, in violation of the Fourth Amendment[.]" ECF 18 at 5. The defendants moved for summary judgment. ECF 45. Morningstar filed a response, and the defendants filed a reply. ECF 54, 55, 56. The summary judgment motion is now fully briefed and ripe for ruling.

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law

determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.*

Excessive-force claims that occur during the course of an arrest or apprehension of a suspect "are governed by the Fourth Amendment's 'reasonableness' standard, which turns on the totality of the circumstances confronting [the officers] viewed from the perspective 'of a reasonable officer on the scene . . . .'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (quoting *Graham v. Connor*, 490 U.S. 396 (1989)). "Whether a particular use of force was objectively reasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Id*. (quoting *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 520 (7th Cir. 2012)). In analyzing these claims, the court must "consider the facts and circumstances of each particular case, including the severity of the crime at

issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight." *Bayon v. Berkebile*, 29 F.4th 850, 854 (7th Cir. 2022) (internal quotation marks and citations omitted). Even the use of deadly force may be reasonable if an officer has probable cause to believe the suspect is armed and poses a threat of physical harm or is about to escape. *See Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020); *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) ("a suspect has a constitutional right not to be shot by an officer unless he 'reasonably believes that [the suspect] poses a threat to the officer or someone else.'"). The perspective as viewed from a reasonable officer on the scene is critical. *Siler*, 957 F.3d at 759.

> [A] court must consider the amount and quality of the information known to the officer at the time. In seeking to understand the perspective of the officer on the scene, we must consider: the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances. Law enforcement officers on the scene do not have the luxury of knowing the facts as they are known to us, with all the benefit of hindsight, discovery, and careful analysis. Officers must act reasonably based on the information they have. We must always keep in mind that encounters in the field require officers to make split-second decisions of enormous consequence. If a reasonable officer in [the defendant's] shoes would have believed that [the plaintiff] posed an imminent threat of serious physical harm, or that he had committed a crime involving serious physical harm and was about to escape, the Officer's use of force was reasonable.

*Id.* (brackets, internal quotation marks, and citations omitted).

The defendants provide their own affidavits, in which they attest to the following facts: On October 5, 2020, Officer Aguilera was at a hotel completing a report for an armed robbery that had occurred when he received a report that another armed

3

robbery had just occurred across the street at the Travel Lodge motel. ECF 45-1 at 1. Officer Aguilera drove his police vehicle to the Travel Lodge motel and saw an employee and the manager on the second floor of the motel. *Id.* at 2. The employee and manager shouted to Officer Aguilera that a man who just robbed someone with a gun was in Room 237. *Id.*[1] The manager advised Officer Aguilera the suspect was a white male. *Id.* Officers Whitney Woods, Craig Walters, and Michael Bodeker arrived on scene and the officers made their way to the second floor. *Id.* An employee had his foot in the door to Room 237 and advised the officers the suspect was in there. *Id.* The officers then heard the voice of a man they were familiar with, known as Chase, coming from the bottom of the stairs. *Id.* They went downstairs to speak to Chase, and Chase informed them the man that had robbed him with a gun was up in that room. *Id.* at 3. At that point, the manager yelled down to the officers, "Hey, this guy just ran out of the room!" *Id.* Officer Aguilera saw a white male, later identified as Morningstar, running out of the doorway. *Id.* Officer Aguilera made eye contact with Morningstar and began chasing him across the parking lot. *Id.*

Morningstar ran from the police officers across the parking lot while looking back at them. ECF 45-1 at 3. The officers chased Morningstar, believing him to be the armed robbery suspect. *Id.* Morningstar was holding his mid-section with his right hand, causing Officer Aguilera to believe he was grabbing or holding a weapon in his

---

[1] The Travel Lodge manager and employee's statements are not hearsay because they are not being offered to prove the truth of the matter asserted, but rather to show the defendants' knowledge at the time of the incident.

4

waistband. *Id.* Officer Aguilera unholstered his firearm. *Id.* During the foot pursuit, the officers yelled at Morningstar, identifying themselves as police and ordering him to stop and put his hands into the air. *Id.* Morningstar did not comply and continued to run. *Id.* Morningstar then tripped and fell. *Id.* As Morningstar attempted to get back up, Officer Aguilera caught up to him and pushed against his back, forcing him to lay flat on his stomach. *Id.* Morningstar put his hands beneath him while Officer Aguilera pushed down on him. *Id.* at 3-4. His right hand was at his midsection. *Id.* at 4. Officer Aguilera tried to push down on Morningstar so he could not pull anything out from underneath him, but he still was moving his right arm trying to tug on something. *Id.*

The officers all were yelling at Morningstar to stop resisting and show his hands. ECF 41-1 at 4. Morningstar ignored their commands, continued to actively resist, and kept both of his hands beneath him. *Id.* Officer Aguilera could see Morningstar's right hand tugging at his waistband. *Id.* During the struggle, Officer Bodeker saw Morningstar had a black firearm in his hand, and yelled "Gun!" ECF 45-2 at 2. Officer Bodeker then yelled out "Taser!" and deployed his taser against Morningstar's back side, but it was not effective. *Id.* Almost simultaneously after the taser made contact, Morningstar began firing shots from his gun, which was still underneath him. *Id.*; ECF 45-1 at 4. The bullets were going in the direction of Officer Bodeker, and he could feel the snap of the bullets go by his leg. *Id.* Officer Aguilera, fearing for his life and the lives of the other officers and bystanders, used his firearm and shot Morningstar on the right shoulder blade side of his back. ECF 45-1 at 4-5. Officer Aguilera then manipulated Morningstar's left arm and handcuffed his left wrist. *Id.* at 5. Officer Aguilera tilted

5

Morningstar to his right side and saw a black handgun with his fingers still wrapped around it. *Id.* He manipulated Morningstar's fingers off the handgun and placed his right arm in handcuffs. *Id.* The officers immediately administered medical assistance to Morningstar until medics arrived. *Id.*

In his deposition, Morningstar testified to a different version of the facts: On October 5, 2020, Morningstar was visiting a friend in a room at the Travel Lodge motel. ECF 49 at 20. He had a gun with him. *Id.* At some point, Morningstar left the motel room, went downstairs to the parking lot, and began jogging across the parking lot to the gas station. *Id.* at 21-22. He was carrying a fanny pack with drugs and was holding his gun in his hand inside of his hoodie. *Id.* at 22, 31. While Morningstar was jogging across the parking lot, he heard a bunch of yelling behind him, got shot with a taser, fell down, and got shot with a bullet through the back. *Id.* at 24, 32. He was unaware he was being chased by police officers, never looked back at the police officers while they were chasing him, and never heard the police officers give him any orders or say anything to him. *Id.* at 24-27, 33. He was clutching the gun underneath his body while he was laying on the ground, and the gun likely discharged because his muscles involuntarily constricted when he was tased and shot. *Id.* at 26-27.[2]

The defendants argue summary judgment is warranted in their favor because (1) they did not use excessive force against Morningstar but rather used only a

---

[2] Morningstar testified in his deposition that his gun likely discharged because his muscles contracted when he was shot in the shoulder by Officer Aguilera, but he now concedes in his response to the summary judgment motion that his gun began firing when he was tased by Officer Bodeker. ECF 54 at 6. He does not dispute that his gun fired before he was shot by Officer Aguilera. *See id.*

6

reasonable amount of force to effectuate his arrest and, regardless, (2) they are entitled to qualified immunity because their conduct did not violate clearly established statutory or constitutional rights. ECF 46 at 10-13. In his response, Morningstar argues the defendants used excessive force against him because they chased him across the parking lot, tased him, tackled him, and shot him in the shoulder despite the fact that he was not involved in the armed robbery investigation and was at most a suspect for a misdemeanor for fleeing law enforcement. ECF 55 at 5-8.

Here, the defendants used force against Morningstar on two occasions by: (1) tasing and tackling him to the ground; and (2) shooting him in the shoulder once he was on the ground. Each use of force must be examined individually.

First, no reasonable jury could conclude the defendants used excessive force against Morningstar by tackling and tasing him while he ran through the parking lot. Specifically, it's undisputed that the defendants: (1) received a report of an armed robbery; (2) were informed by the Travel Lodge manager that the suspect, a white male, was in Room 237; (3) were informed by the Travel Lodge manager that "this guy" had just run out of Room 237; (4) saw Morningstar running across the parking lot with his hand at his waistband; and (5) yelled out to Morningstar to stop but he continued running.[3] Accepting as true Morningstar's assertions that he was not involved in the armed robbery and was tased and tackled by the defendants before he even realized he

---

[3] Morningstar testified in his deposition that he did not look at the defendants or hear them say anything to him while he was running through the parking lot, but he concedes he heard "a bunch of yelling" and "a commotion" behind him while he was running through the lot. ECF 49 at 24; ECF 54 at 2.

7

was being pursued, the defendants' conduct of tackling and tasing Morningstar was nevertheless a reasonable amount of force given the fact that he was actively running away from the scene of an armed robbery with his hand in his waistband, the Travel Lodge manager identified Morningstar as having run out of the room where the armed robbery suspect was hiding, and Morningstar continued running and did not respond to their commands to stop and put his hands up. *See Abbott v. Sangamon Cty, Ill.*, 705 F.3d 706, 727 (7th Cir. 2013) ("Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable"); *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011) (use of a taser was reasonable where the suspect had "displayed an unwillingness to accede to reasonable police commands, and his actions suggested an intent to use violence to fend off further police action"). While Morningstar testified he did not hear the defendants' commands, he does not dispute that the commands were given, and a reasonable officer could have concluded Morningstar "displayed an unwillingness to accede to reasonable police commands" by continuing to run through the parking lot. *See id.* Considering the totality of the circumstances, no reasonable jury could conclude the defendants used more force than was reasonably necessary to effectuate Morningstar's arrest by tackling and tasing him while he ran across the parking lot with his hand in his waistband and ignored their commands to stop fleeing.

Moreover, even if a reasonable jury could conclude the defendants used excessive force against Morningstar by tasing and tackling him under these conditions, the defendants are nevertheless entitled to qualified immunity for this conduct.

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (internal quotation marks and citation omitted). To overcome a qualified immunity defense, "a plaintiff must show the deprivation of a constitutional right, and must also show that the right was clearly established at the time of the violation." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Alvarado*, 267 F.3d at 652). "A right is clearly established when existing precedent has 'placed the statutory or constitutional question beyond debate.'" *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The United States Supreme Court has clarified the definition of a "clearly established right" in the context of excessive force cases:

> Under our cases, the clearly established right must be defined with specificity. This Court has repeatedly told courts not to define clearly established law at a high level of generality. That is particularly important in excessive force cases, as we have explained: Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. It does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.

9

*City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42-43 (2019) (quotation marks, ellipsis, citations, and brackets omitted).

Here, Morningstar has not identified, and independent research has not uncovered, any caselaw finding a Fourth Amendment violation where a suspect was tased and tackled under circumstances similar to those here. *See Bell v. Grooms*, No. 3:16-cv-254-JD, 2019 WL 3499394, at *4 (N.D. Ind. July 2019) ("the court has researched the cases of the United States Supreme Court, the Seventh Circuit, the district courts in Indiana, and the Indiana appellate courts" and "[n]o cases were found which held [using a taser on a fleeing misdemeanant who was a suspect in a weapons case] would constitute a Fourth Amendment violation."). Therefore, the undisputed facts show the defendants are entitled to qualified immunity for this conduct.

Second, no reasonable jury could conclude Officer Aguilera used excessive force against Morningstar by shooting him in the shoulder after Morningstar's handgun began firing from beneath his body. Specifically, it's undisputed Morningstar was holding his handgun in his hand and it began firing bullets in the direction of the police officers such that Officer Bodeker could feel the "snap" of the bullets moving past his legs. Accepting as true Morningstar's assertion that he was involuntarily firing his weapon because his muscles contracted when he was tased, Officer Aguilera still had probable cause to believe Morningstar was armed and posed a threat of physical harm. *See Siler*, 957 F.3d at 759; *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (When an officer reasonably believes an assailant's actions place "him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can

reasonably exercise the use of deadly force") (emphasis omitted). Considering the information known to Officer Aguilera at the time – namely, that Morningstar was tackled fleeing from the scene of an armed robbery, was holding a handgun beneath his body, and was firing the handgun in the direction of Officer Bodeker – a reasonable officer in Officer Aguilera's shoes would have believed Morningstar posed an imminent threat of serious physical harm. *See Siler*, 957 F.3d at 759.[4]

Thus, considering the totality of the circumstances known to the defendants at the time of each use of force, no reasonable jury could conclude they used greater force than necessary to effectuate Morningstar's arrest. Summary judgment is therefore warranted in favor of the defendants.

For these reasons, the court:

(1) GRANTS the defendants' motion for summary judgment (ECF 45); and

(2) DIRECTS the clerk to enter judgment in favor of the defendants and against Lange Morningstar and to close this case.

SO ORDERED on February 20, 2025.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT JUDGE

---

[4] Because it's clear from the undisputed facts that Officer Aguilera did not use excessive force against Morningstar by shooting him in the shoulder, the court does not reach the defendants' alternative argument that Officer Aguilera is entitled to qualified immunity for this conduct.